Good morning. May it please the court. My name is Kayla Williams. I represent the appellant. The issue here is determining what conduct satisfies section 2D1.1B13A's requirement of knowingly misrepresenting or marketing a substance containing fentanyl. Here Mr. Little did not communicate in any way that would satisfy the misrepresentation requirement nor did he sell, attempt to sell, or otherwise advertise these imitation pills to satisfy the marketing requirement. The analysis for this enhancement is fact-intensive and so the facts here are Mr. Little was under the investigation of the DEA for about the month of March. During that time they observed Mr. Little engage in drug sales of fentanyl and crack cocaine and purchase drugs directly from him. During this investigation at no time did Mr. Little communicate that he was in possession of imitation pills. He did not advertise the sale of those imitation pills. He didn't include them in a bundle deal of any sort with other drug deals that he had and up until the actual execution of the search of his residence, law enforcement did not suspect that he engaged in the distribution of imitation pills. During that search they did question Mr. Little and he made a statement that was admitted at sentencing. That statement, we still hold the position should not have been admitted due to reliability issues surrounding the context of the statement. However, to give deference as I must to the court, that statement still does not satisfy the misrepresentation requirement. That statement, while we don't know a lot of things surrounding it, we do know that Mr. Little did admit to the law enforcement that the pills contained fentanyl. What we also know is that that statement was not being made to an individual he was distributing to, but rather to law enforcement in response to their questioning. What about the imprint on the pills and the amount of pills? We believe that, if I can first start with the markings. The markings themselves do not satisfy the misrepresentation requirement because the markings were not seen by someone to be deceived and also all the cases the parties have cited, all the cases involve markings mislabeled pills. None of them stand for the assertion that the markings alone do not satisfy misrepresentation. There's always some other conduct on top of that. The possession of the pills in their sheer number, the court can infer an intent to distribute. But I would say that the guidelines, if we look to those, the commission knows how to punish for intent. The commission also knows how to punish for strict liability, the characteristic of an enhancement. Looking to theft, fraud, child exploitation, and a number of other guidelines. So just looking plainly, the commission wants the actual intent to not be the issue. It's the way these cases, these pills are distributed, the deception that's actually occurring. And so we believe that statement, if all inferences are made related to he intended to distribute, it still does not satisfy. You know, I follow the argument, but I keep kind of hanging up on the statement where he says, if you believe that I'm selling OxyContin for that price, you're stupid. You know? I mean, I'm going, wow. As you look at what inferences can reasonably be drawn from that statement in combination with the markings on the pills and everything else, it's a hard case for you. Yes. I'm sorry. So why shouldn't that inference kind of be the thing that pushes it over? The inference of he would be distributing is a fair inference. The question we have is how would he distribute is the next question. And that's what I think the guidelines get to. We have a lack of misrepresentation to law enforcement, even. We have an individual that is admitting that these pills represent and contain fentanyl. We have an individual who at no point during this investigation that he even attempted to sell these pills. He didn't make anyone aware that he had these pills. I grant the court's deference in that not accepting the story that was told by the defendant for why he possessed those pills. But even with the worst case inference, there is not an inference of misrepresentation that is also required, a communication of some sort. No one was deceived. There needs to be a completed act here, not just the intention. If I may move on.  Thank you. The other thing I wanted to note with both of these phrases, misrepresenting and marketing, they both require the ordinary meaning and the parties agree with that. There was an extensive analysis in the Sixth Circuit through Matthews that talked about what the ordinary meaning of these two things are. Misrepresentation is an individual knowing a substance contains fentanyl communicates in some way to a person they are distributing to that it does not. And for marketing, it's a person sells or otherwise advertises a substance containing fentanyl as something else. The U.S. Supreme Court has some definitions of marketing. Now there are all kinds of cases, I get that. But the Supreme Court has said it's holding the property, holding forth the property for sale and activities preparatory thereto. I'm quoting the Supreme Court. This is the seed case. One of the many cases of this. Do you think that we have enough here for holding forth property and activities preparatory if we're using that kind of definition? I do not. I don't believe there's any conduct that indicates that there was preparation to distribute the pills. Mr. Little is not responsible for creating those pills. There are cases where they say an individual is actually making the markings, is mixing the pills. All of those things are steps towards preparation to distribute those pills. Here the pills weren't even individually wrapped for individual sale. They were still contained in a mass Ziploc container. So I'd say based on the lack of action we know throughout the investigation, the statements made and the way the pills were stored, there's no preparation for to put these or enter these into the market. Even with that definition, Your Honor. If I could briefly touch on before I'm into my rebuttal time, the harmless error issue. Because we believe that this enhancement was misapplied, we do believe that the error was not harmless. The guideline range would have been 151 to 188 months but for the error. The court sentenced Mr. Little to 235 months. We believe it's our position that the statement the court made, regardless he would impose the sentence, was intended to cover any potential guideline errors without considering the alternative range. There was actually no discussion of the alternative range at sentencing or in the 15-page post-sentencing memorandum the court filed. During sentencing and in that memorandum, the court discussed the appropriateness of the enhancement, the facts surrounding the enhancement that supported the enhancement. It never discussed an alternative range nor did it discuss why 235 months would be appropriate. The court was very much tethered to the miscalculated range, similar to as the United Supreme Court has talked about in Pugue. As sentences go up, same do the range. Here the court anchored itself in the range and then did an analysis into the 3553A factors. In that, the court found that Mr. Little's background supported mitigating lowest end of the guidelines. Here, without the explanation, the court cannot give a meaningful review of the court's explanation. There's a brief remark regarding fentanyl and gun possessions. Those are both factors that would have been considered in the lower, more appropriate range. Without an explanation, the more substantial the variance, as this court has explained, the more substantial the explanation. We simply have no explanation that gets into why the court would have imposed this sentence otherwise. I can discuss this further in my rebuttal, but if there's no further questions, I'd like to reserve my time. You certainly may. Thank you. Ms. Lane. Good morning. May it please the court. I'm Linda Lane, an assistant U.S. attorney representing the United States. Application of the four-level enhancement does not require proof of sale or an attempted sale. We only get to this enhancement if there is a plea of guilty or a jury verdict that the defendant manufactured, distributed, dispensed, or possessed with the intent to manufacture, distribute, or dispense a controlled substance. That statute does not require proof of a sale or an attempted sale. How about preparation? Does it require preparation? I believe that if you are looking at manufacturing, yes. If you're looking at the statute 841 based on the distribution, yes, and dispensing it, yes. It all would require some preparation or them to do something, but it doesn't require an actual sale nor an attempted sale. Therefore, the enhancement doesn't either. Here we have the defendant, Little. He pled guilty to the possession with the intent to distribute. Now, I want to pause and make it clear that the argument that I'm making is not what the district court relied on. The district court found that there was an actual sale. However, if we rely or believe in some fictitious land what the defendant argued, that he possessed the controlled substances, the 1,600 tablets, in order to give them to a cattle, that is  The defendant, in his guilty plea agreement, stated that he purchased those pills for $1,000. If he then, after purchasing pills that he knew were marked and appeared to be oxycodone but were in fact fentanyl, then simply hands them to Kevin, no sale, no attempted sale. He has just distributed the controlled substances, and because the pills misrepresent what they are, without him saying anything, they are branded to be something that they are not. That is the misrepresentation. If he knows that misrepresentation, he has adopted it, and if he knows that it is in fact fentanyl, the enhancement applies, even if he simply hands them to Kevin as he suggests. We would argue that the court, the district court in this case, found much more than that. The district court held that it believed the defendant knew these pills were, again, fentanyl. They were marked as oxycodone, which he acknowledged, and that he was selling the pills. This is supported by the fact that, as the bill testified, that he was a known drug dealer. There were controlled buys observed at his home. His criminal history showed a 20-year history of distribution or possession of controlled substances. Two days prior to the execution of the search warrant, controlled substances buys or controlled buys were observed at his home. The items found in the home support that he was, in fact, a known drug dealer. There were capsules. There were empty capsules. There were pill cappers, blenders, multiple controlled substances, 100-plus pills of methamphetamine in addition to the 1,600 pills of fentanyl, powder fentanyl, etc. Little testified that he understood the market for the pills. He understood the target market to be young people. He understood the pricing of the pills that is much higher than fentanyl, that he had purchased them, again, in his plea agreement. He stated he purchased them. All of this supports a finding that it's more likely than not that the defendant was selling the pills, even if we don't consider the hearsay statement. However, the hearsay statement puts the nail in the coffin. He said he was selling these pills. The court properly relied on that hearsay statement when it found that it believed, again, that the defendant was, in fact, selling these pills. He knew that they were... This is the really stupid quotation, right? Again, I'm giving the G-rated version. Yes, Your Honor. Again, the court's reliance on that statement is satisfied. Again, there is some argument that it is unreliable hearsay based on the information coming through Detective Priddy. The defendant testified himself, giving the court an opportunity to judge the credibility of the statement versus what the defendant rebutted in regards to saying that he denied it, he didn't make the statement. Well, now, the court could only judge Priddy's credibility, right? Not Drago's. Yes, Your Honor. Okay, proceed. But I would note that the way in which the statement was documented, it wasn't... Priddy did not testify to what Drago told him. Priddy testified to what was memorialized in a police report. The nature of the police report itself lends some credibility to the statement. The fact that, again, he's reading what was in the police report, he is also not simply someone coming into court regurgitating what he had heard. He was present during the statement, and although he admits, truthfully, that he didn't hear the exact statement, but he heard conversations about... He heard the China yellow, right? He testified that he himself heard the China yellow statement. Yes, Your Honor. He heard their discussions... Detective Priddy said he overheard the China yellow. Yes. And little confirmed that there was a discussion between him and Detective Drago. He stated that he asked me what those pills were, and I said they looked like OxyContin. The defendant testified and confirmed that, gave credibility to the statement as memorialized by Detective Drago in the report. Again, we would note that there are many inconsistencies in the statements, in the testimony of little, that the court indicated led it to believe that this defendant's testimony or denial of making the statement was incredible based on all of the inconsistencies in his testimony regarding whether or not he was a drug dealer, whether or not he sold the pills, whether or not he made the statement. He stated he remembered everything, but he didn't recall some of the statements because he was high on heroin. There were a number of inconsistencies in the defendant's statement, and we believe that the court's reliance or note of that also adds credibility to the reliability of the hearsay statement being Defendant... I'm sorry, Detective Drago's report, the statement that he made in the report. In regards to harmless error, in this case, the court explicitly stated that the defendant implicitly stated that regardless of how it treated the guidelines, he would impose the same sentence, regardless of how he treated the enhancements, regardless of his findings in regards to the objections. He stated that he would impose the same sentence because of the very, very lethal and small doses, the number of it, the quantity of it. We would and the defendant was in possession of firearms. We would note that the defendant was in possession of over 845 grams of fentanyl. The court is acknowledging that the weight is considered by the guidelines, but the number of small doses of lethal fentanyl that he had, the substantial amount of small doses of lethal fentanyl. We would argue that if the statute for if one is convicted with possession of over 400 grams of fentanyl would be 10 years to more than life. That would be the range within the statute. Here we believe that the 235 months is within that and appropriate based on the court's statement that it considered this a very serious offense based on the dosages, as well as the court stated that it had considered amongst the 3553A factors, the defendant's criminal history, the nature and circumstances of the offense, and that the defendant possessed multiple firearms to protect his drugs. The court also considered the fact that count three was dismissed. I would note that if count three, the defendant had fled to count three, the court would have been required to sentence the defendant to a term within this without the four level enhancement, 150 months to 188 months, a 60 month term consecutive to that. That would place a range of 211 to 248 months. This sentence of 235, again, still is within that range. Because the court does give sufficient basis for its inclusion or its sentencing, we believe that the court should affirm. Thank you, counsel, for the argument. Ms. Williams. Thank you, your honor. If I can begin by correcting one calculation. Had this 924C not been dismissed, the guideline range would have adjusted down to 130 to 162 months because the plus two for the guns would not have been applied. That plus 60 months would actually be 162 to 222 months, which is less than the 235 month sentence that the court imposed. Secondly, during sentencing, I actually presented to the court, there was a guideline study regarding the overdoses from distributions that these guidelines are trying to punish. This sentence was higher than the average sentence over a 13 year period that even fatal overdoses are receiving. The court did not address that in its assessment of the appropriateness of the sentence. Can I presume that you don't think that Detective Priddy testifying as to what the other officer said in the police report renders the police report more credible? No. Did you hear that? I mean, I was trying to figure out how does that work? Yes, Your Honor. I'm working my way backward, but I would say that Detective Priddy in the cross-examination actually said he could not give a lot of specifics around the conversation. What he heard was the chime of yellow and what he read and interpreted in quotes was what he was reciting. However, he can't tell us how the conversation came out, what hypotheticals were posed. There were a lot of things about, sure, Detective Priddy can certainly read. He can read a police report and that's what he did for us, but he did not give us the circumstance of what happened in that conversation. The last thing I'd like to note for the court is if the court is going to look at harmless error cases, I believe we cited Ecaza and we cited Martinez and I also believe Baugh, which is through McGrew and Ecaza both assessed. I believe those are the most similar to our harmless error arguments. I appreciate the court's time. Thank you very much. Thank both counsel for their argument. Case number 25-1529 is submitted for decision by the court and counsel are of course excused.